IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

FAMILY FOOT AND LEG CENTER PA,

      Plaintiff,

v.                                                  CIVIL CASE NO. _____

ROBERT F. KENNEDY, JR.,
SECRETARY OF THE UNITED STATES
DEPARTMENT OF HEALTH
AND HUMAN SERVICES;

and

DR. MEHMET OZ,
ADMINISTRATOR
FOR THE CENTERS FOR MEDICARE
AND MEDICAID SERVICES,

      Defendants.

_____

## VERIFIED COMPLAINT / APPEAL

      COMES NOW the Plaintiff, FAMILY FOOT AND LEG CENTER, PA, a

Florida professional association ("FFLC" or "Plaintiff"), to sue the Defendants,

ROBERT F. KENNEDY, JR. as Secretary of the United States Department of Health

and Human Services (HHS), and DR. MEHMET OZ as Administrator for the

Centers for Medicare and Medicaid services (CMS), alleging as follows:

# I.  <u>NATURE OF ACTION / APPEAL</u>

1.     The Plaintiff respectfully requests that the District Court review the

Defendants' Final Orders in the following Office of Medicare Hearing and Appeals

(OMHA) matters:

Count I: OMHA Appeal No. 3-12280366926, Docket No. M-24-937 (**Exhibit A**)
Count II: OMHA Appeal No. 3-11787749213, Docket No. M-23-4977 (**Exhibit B**)
Count III: OMHA Appeal No. 3-12240064967, Docket No. M-24-945 (**Exhibit C**)
Count IV: OMHA Appeal No. 3-11787454963, Docket No. M-23-5175 (**Exhibit D**)
Count V: OMHA Appeal No. 3-11807413697, Docket No. M-23-4972 (**Exhibit E**)

True copies of the Final Orders are attached hereto as **Exhibits A through E**. Each

of these Final Orders involve the same provider (although different beneficiaries)

and common questions of laws and facts, *i.e.* principally the administration by

injection of Procenta® to a Medicare recipient.

2.     Plaintiff is a podiatry practice which treats Medicare patients in

Naples, FL. In turn, Plaintiff seeks reimbursement of its fees for services rendered

to Medicare beneficiaries from CMS, which is overseen by the HHS. For each of

the appeals referenced above, CMS alleged that it overpaid Plaintiff and seeks to

recoup (claw back) that money with interest thereon. Plaintiff, having exhausted

the administrative appeal process pursuant to 42 C.F.R. Part 405, seeks judicial

review of the final agency decisions in accordance with 42 C.F.R. § 405.1877.

## II.    <u>JURISDICTION AND VENUE</u>

3.    This action arises under Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.*, the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.*

4.    This Court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g) as applied to Medicare appeals by 42 U.S.C. §1395ff, which authorizes judicial review of a final agency decision of the Secretary.

5.    The Plaintiff is filing suit after receiving final decisions of the Secretary denying coverage of its Medicare claims and affirming an overpayment and, therefore, has exhausted its administrative remedies.

6.    The amount-in-controversy is greater than $1,900.00 as set forth in 42 U.S.C. §§ 1395ff(b) and § 1869(b) of the Social Security Act.

7.    In accordance with Section 1878(f)(1) of the Social Security Act (the "Act") and 42 C.F.R. § 405.1130, this suit is timely filed within sixty (60) days of the date upon which the Plaintiff received CMS's final agency decisions.

8.    In general, where a party seeks judicial review of the CMS's final decision in the Medicare claims appeal context, venue is proper "in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business, or, if he does not reside or have his principal

place of business within any such judicial district, in the United States District Court for the District of Columbia." 42 U.S.C. § 405(g); 42 U.S.C. § 1395ff(b)(1)(A).

9.      Thus, venue is proper in the Fort Myers Division of the United States District Court for the Middle District of Florida, as the Plaintiff conducts business within the jurisdictional territory of the Court and the cause of action arose in Naples, Florida.

### III.    <u>THE PARTIES</u>

10.      Plaintiff, Family Foot and Leg Center, PA, (FFLC) is a Florida professional association. FFLC provides podiatric medical services with its principal place of business located at 730 Goodlette Frank Road, N, Suite 102, Naples, Florida 34102.

11.      FFLC is, and has been, enrolled in the Medicare program pursuant to a Medicare Enrollment Application submitted to Centers for Medicare and Medicaid Services, and, at all times relevant to this action, followed all applicable federal statutes and regulations and was enrolled as a provider of services in the Medicare program.

12.      Defendant, Robert F. Kennedy, Jr., Secretary of Health and Human Services, United States Department of Health and Human Services ("Secretary"),

maintains his principal office at 200 Independence Avenue SW, Washington, DC 20201. Secretary is being sued in his official capacity only.

13.    HHS is the federal agency of the United States of America charged with overseeing the operation of the Medicare program.

14.    Defendant, Dr. Mehmet Oz, Administrator, Centers of Medicare and Medicaid Services, Office of External Affairs, maintains his principal office at 7500 Security Blvd., Baltimore, MD 21244.

15.    CMS operates and regulates the Medicare payment system nationwide. It also directs its contractors, who are responsible for the first two levels of administrative review of Medicare claim denials.

16.    The Office of Medicare Hearings and Appeals (OMHA) generally conducts the third level in the Medicare claims appeal process and operates separately from the other contractors involved in the appeal process.

17.    The Departmental Appeals Board (DAB) within the HHS provides the fourth level of administrative review.

18.    References to the Secretary herein are intended to include CMS, its contractors, and any of their successors or predecessors.

## IV.    <u>STANDARD OF REVIEW</u>

19.    A federal district court's review of a final decision of the Secretary as to Medicare coverage is limited to: (i) whether the Secretary's factual findings were supported by substantial evidence; (ii) whether the Secretary applied the proper legal standards; and (iii) whether the Secretary's decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 42 U.S.C. § 405(g); 5 U.S.C. § 706(2)(A); *Sternberg v. Sec'y, Dep't Health & Human Servs.*, 299 F.3d 1201, 1205 (10th Cir. 2002) (holding that the substantial evidence test is substantively the same as the review for arbitrariness or caprice); *Porzecanski v. Azar*, 316 F. Supp. 3d 11, 17 (D.D.C. 2018), aff'd, 943 F.3d 472 (D.C. Cir. 2019); *LivinRite, Inc. v. Azar*, 386 F. Supp. 3d 644, 652 (E.D. Va. 2019); and *Becker v. Sebelius*, No. 12-cv-6177, 2014 WL 2711958, *1, *3 (D.N.J. June 13, 2014).

20.    Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks omitted); *see also Fratellone v. Sebelius*, No. 08-cv-3100, 2009 WL 2971751 *1, *9 (S.D.N.Y. Sept. 16, 2009) (citing *Murphy v. Sec'y of Health & Human Servs.*, 62 F. Supp. 2d 1104, 1106 (S.D.N.Y. 1999)).

21.     While deferential, this review "is not a rubber stamp for the Secretary's decision and involves more than a search for evidence supporting the Secretary's findings." *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985) (citing *Tome v. Schweiker*, 724 F.2d 711, 713 (8th Cir. 1984)).

22.     The Court's factual review is limited to the administrative record. *See Mathews v. Weber*, 423 U.S. 261, 263, 270 (1976) (holding that under 42 U.S.C. § 405(g), the "court may consider only the pleadings and administrative record" and "neither party may put any additional evidence before the district court.").

23.     However, the assessment of whether substantial evidence supports a decision of the Secretary requires the court to review the administrative record as a whole. This includes looking at evidence supporting the Secretary's position, as well as other evidence that detracts from it. *Alston v. Sullivan*, 904 F.2d 122, 126 (2d. Cir. 1990); *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002); *Goffney v. Becerra*, 995 F.3d 737, 747 (9th Cir. 2021); 5 U.S.C. § 706. HHS "has codified [this] requirement in a regulation that directs the Office of Medicare Hearings and Appeals . . . to include in the record 'the appealed determinations, and documents and other evidence used in making the appealed determinations and the ALJ's or attorney

adjudicator's decision,' as well as any proffered evidence excluded by the adjudicator." *Goffney*, 995 F.3d at 747 (quoting 42 C.F.R. § 405.1042(a)(2)).

24.    In contrast to the deference due to findings of fact, the Secretary's (or in this case, Administrative Law Judge's ("ALJ")) conclusions of law as to Medicare coverage are reviewed *de novo*, and failure to apply the correct legal standards is grounds for reversal. 42 U.S.C. § 405(g); *see also Keefe*, 71 F.3d at 1062; *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004).

25.    Pursuant to the Administrative Procedures Act ("APA"), the Secretary's final decision may also be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Palomar Med. Ctr. v. Sebelius*, 693 F.3d 1151, 1159 (9th Cir. 2012); *Porzecanski*, 316 F. Supp. 3d at 17; *LivinRite*, 386 F. Supp. 3d at 652.

26.    To meet the requirements of the APA, an agency must "examine the relevant data and articulate a satisfactory explanation for its action." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (internal citations omitted).

27.    In reviewing that explanation, the court "must consider whether the decision was based on a consideration of the relevant factors and whether there

has been a clear error of judgment." *Motor Vehicles Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Porzecanski*, 316 F. Supp. 3d at 18.

28.    An agency will have acted arbitrarily and capriciously where "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43; *see also Porzecanski*, 316 F. Supp. 3d at 18.

29.    The Court of Appeals for the D.C. Circuit has made clear that the propriety of an agency's decision is "a question of law, and only a question of law." *Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993); *see also Embassy of Blessed Kingdom of God for All Nations Church v. Holder*, 6 F. Supp. 3d 559, 561 (E.D. Pa. 2014), aff'd sub nom.; *Embassy of Blessed Kingdom of God for All Nations Church v. Att'y Gen. U.S.*, 591 F. App'x 161 (3d. Cir. 2014) (citing *Marshall County* for the same); *Validus Reinsurance, Ltd. v. U.S.*, 786 F.3d 1039, 1042 (D.C. Cir. 2015).

## V.    MEDICARE PROGRAM

30.    Congress enacted the Medicare Program in 1965 under Title XVIII of the Social Security Act to provide health insurance primarily to individuals sixty-five years of age and older, disabled persons, and those with end-stage renal disease. Social Security Amendments of 1965, Pub. L. No. 89-97, 79 Stat. 286 (1965) (codified as amended at 42 U.S.C. §§ 1395-1396v).

31.    The Medicare Program seeks to ensure that its beneficiaries have access to health care services. *Id.* at 286.

32.    The Medicare Program is made up of four separate parts—Part A, Part B, Part C, and Part D.

33.    Relevant to this matter, Medicare Part B refers to the supplementary medical insurance program authorized under Part B of Title XVIII of the Social Security Act. 42 U.S.C. § 1395k(a)(1); 42 C.F.R. § 400.202. Part B supplements Part A which includes diagnostic laboratory tests and other diagnostic tests. *See also* 42 C.F.R. § 410.10.

34.    Providers and suppliers enroll in the Medicare Program by completing an application and undergoing a certification process to verify their licensing and other credentials. Providers and suppliers enroll with the Medicare Administrative Contractor ("MAC") for CMS to administer claims for the

Medicare benefit category applicable to the provider or supplier's covered services for the geographic locale in which the provider is physically located. 42 C.F.R. §§ 421.404(b)(1), (c)(1).

35.     Under Medicare Part B, beneficiaries pay a monthly premium to receive coverage for the various forms of supplementary medical services that are enumerated at 42 U.S.C. § 1395x.

36.     The U.S. District Court for the District of Columbia has expressly recognized that "Medicare Part B beneficiaries have a protected due process 'property interest' in 'receiving the medical insurance benefits for which they paid a monthly premium.'" *Bailey v. Mut. of Omaha Ins. Co.*, 534 F. Supp. 2d 43, 53–54 (D.D.C. 2008)(quoting *Gray Panthers v. Schweiker*, 652 F.2d 146, 148 n. 2 (D.C. Cir. 1980)).

37.     While beneficiaries are the primary parties in interest to the Medicare Part B program, providers and suppliers are likewise parties in interest "as assignees of the beneficiaries." *Cervoni v. Sec'y, Health, Educ. & Welfare*, 581, F.2d 1010, 1018; 42 C.F.R. § 400.202; *see also Med-Cert Home Care, LLC v. Azar*, 365 F. Supp. 3d 742, 751 (N.D. Tex. 2019) (stating that "[p]recedent makes clear that [the provider] has a valid property interest in receiving Medicare payments for services

11

rendered"); *A1 Diabetes & Med. Supply v. Azar*, 937 F.3d 613, 619 (6th Cir. 2019) (finding that the provider "plainly ha[d] a significant 'private interest': payment for services rendered").

38.    The U.S. District Court has long recognized the rights of providers and suppliers under the Medicare Program, stating that "[t]he purpose of the Medicare [P]rogram is to reimburse providers for their reasonable costs." *Am. Med. Int'l, Inc. v. Sec'y, Health, Educ. & Welfare*, 466 F. Supp. 605, 626 (D.D.C. 1979).

39.    In practice, when medical providers and suppliers, furnish services to a Medicare Part B beneficiary, the providers or suppliers thereafter submit a claim for reimbursement based on the beneficiary's assignment of their property interest to the provider or supplier.

40.    Medicare providers and suppliers are statutorily entitled to reimbursement for services rendered to Medicare Part B beneficiaries under 42 U.S.C. § 1395l.

41.    Providers and suppliers submit these claims for reimbursement to a MAC. 42 U.S.C. § 1395ff(a)(2)(A). As discussed in Section V(A)(i) below, MACs are government contractors responsible for processing Medicare claims and making payments. 42 U.S.C. §§ 1395kk-1(a)(3).

A.    **Entities Involved in Medicare Claims Appeal Process**

42.    While CMS is the HHS agency responsible for administering the Medicare Program, CMS has contracted with various private entities to assist CMS in processing and auditing claims for reimbursement, and in the appeals process itself.

i.    **Medicare Administrative Contractors**

43.    CMS contracts with Medicare Administrative Contractors (MACs) to process and audit claims that have been submitted by Medicare providers for payment in a particular geographic jurisdiction of the country. 42 U.S.C. § 1395kk-1(a).

44.    MACs are statutorily authorized to perform the following functions: (i) determining the amount of reimbursement to providers and suppliers; (ii) paying such reimbursements to the applicable provider or supplier; (iii) providing education and assistance to Medicare Part A and B beneficiaries; (iv) providing consultative services to institutions, agencies, and others regarding maintenance of fiscal records necessary for reimbursement; (v) communicating with providers and suppliers regarding instructions from CMS; (vi) performing functions related to provider education, training, and technical assistance; (vii) developing LCDs,

which are determinations "under [P]art A or [P]art B, as applicable, respecting whether or not a particular item or service is covered . . . under such parts" for the geographic zone assigned to the MAC; (viii) overseeing an improper payment outreach and education program; and (ix) such other functions as are necessary or as specified in CMS's agreement with the MAC. *Id.* at §§ 1395kk-1(a)(4), 1395ff(f)(2)(B); 42 C.F.R. §§ 421.100, 421.200, 421.400.

45.    In addition, MACs handle provider and supplier enrollment, as well as redeterminations, which form the first level of the Medicare claims appeal process. 42 C.F.R. §§ 421.200, 421.404.

46.    MACs are required to follow federal statutes, regulations, and CMS program guidance.

### ii.    Unified Program Integrity Contractors

#### a.    UPICs

47.    Unified Program Integrity Contractors ("UPICs"). UPICs are a form of a Recovery Audit Contractor (RAC) under 42 U.S.C. § 1395ddd, and CMS is authorized to contract with UPICs to fulfill program integrity functions for the Medicare Program. 42 U.S.C. § 1395ddd.

48.    The UPIC is authorized to: (i) prevent fraud by identifying program vulnerabilities; (ii) proactively identify incidents of potential fraud, waste, and

abuse that exist within its service area and take appropriate action; (iii) investigate allegations of fraud; (iv) explore available sources of fraud leads in its jurisdiction; (v) initiate appropriate administrative actions where there is reliable evidence of fraud, including, but not limited to, payment suspensions and revocations; and, (vi) refer any necessary provider or supplier outreach to the provider outreach and education staff at the MAC. 42 U.S.C. § 1395ddd(b); 42 C.F.R. § 421.304; 42 C.F.R. § 405.371(a)(1); MPIM Ch. 4, § 4.2.2.1.

49.    UPICs are tasked with identifying both overpayments and underpayments. *See e.g.*, 42 U.S.C. §§ 1395ddd(b) and (h), 1395g(a); 42 C.F.R. § 421.304; MPIM Ch. 8, §§ 8.4.1.3, 8.4.4.4.4, 8.4.5.2, 8.4.7.1.

50.    UPICs are awarded one of CMS's five UPIC multiple-award indefinite-delivery, indefinite-quantity ("IDIQ") contracts for the five UPIC geographic jurisdictions, and these IDIQ contracts contemplate a "cost plus award fee" payment model. *See e.g.*, GAO, *Decision in re AdvanceMed Corp.*, B-415360; B-415360.2; B-415360.3, at 2 (Dec. 19, 2017); CMS, "UPIC Jurisdiction 1 Task Order, Statement of Work," at 1, available at the following website: https://sam.gov/opp/c5df515b5cf3afcb0d8fcd4e20c7acba/view#attachments-links.

51.    Generally, UPICs are paid a base fee in addition to an award fee that is awarded based on quality (e.g., accuracy, timeliness, and efficiency in performing tasks), management (i.e., how the UPIC communicates and coordinates with stakeholders), and certain other areas, such as innovation and value-added work. *See* CMS, "UPIC Jurisdiction 1 Award Fee Plan," at 2–3, 6, available at the following website: https://sam.gov/opp/c5df515b5cf3afcb0d8fcd4e20c7acba/view#attachments-links.

52.    In addition, starting in year two of a contract or task order, the UPIC has the potential for an "Excellence Award" that will be based on the Center for Program Integrity ("CPI") reaching its Return on Investment ("ROI") and the UPIC itself achieving high marks in its evaluation. *Id.* at 9–11.

### iii.    Qualified Independent Contractors

53.    Under 42 U.S.C. § 1395ff, CMS is mandated to "enter into contracts with qualified independent contractors to conduct reconsiderations of [redetermination decisions.]" Contracts between CMS and qualified independent contractors ("QICs") are to last for an initial term of three years and are renewable on a triennial basis thereafter. 42 U.S.C. § 1395ff(c)(1).

54.    A QIC is statutorily required to be independent of any MAC or UPIC. *Id.* at § 1395ff(c)(2), (c)(3)(K). The QIC must perform such duties and functions and assume such responsibilities as may be required by CMS to carry out the Medicare claims appeal process, "and shall have sufficient medical, legal, and other expertise . . . and sufficient staffing to make reconsiderations[.]" *Id.* at § 1395ff(c)(3)(A).

55.    Each QIC is designated to perform its duties for a specific geographic jurisdiction of the country or by type of service. *See* CMS, "Second Level of Appeal: Reconsideration by a Qualified Independent Contractor," (June 23, 2022), available at the following website: https://www.cms.gov/Medicare/Appeals-and-Grievances/OrgMedFFSAppeals/ReconsiderationbyaQualifiedIndependentContractor.

56.    National coverage determinations ("NCDs"), CMS Rulings, Council decisions, and applicable laws and regulations are binding on the QIC. However, QICs are not bound by LCDs or CMS program guidance—though applicable regulations indicate that a QIC should "give substantial deference to these policies if they are applicable to a particular case." 42 U.S.C. § 1395ff(c)(3)(B)(ii)(I)–(II); 42 C.F.R. § 405.968(b)(1)–(2).

iv.     <u>**Administrative Law Judges**</u>

57.     OMHA is responsible for the third level of the Medicare claims appeal process, whereby a reconsideration decision by the QIC is reviewed by an OMHA adjudicator, and an ALJ hearing can be requested. 42 U.S.C. § 1395ff(b)(1); 42 C.F.R. §§ 405.1000–48.

58.     OMHA was created by the Medicare Modernization Act of 2003 in an effort to make the appeals process more efficient, and OMHA is functionally and  organizationally independent of CMS. *See* Pub. L. No. 108-173, 117 Stat. 2066 (2003); *see also* CMS, MLN006562, Medicare Parts A & B Appeals Process (May 2021).

59.     A hearing may be requested before an ALJ under the regulatory requirements included at 42 C.F.R. § 1000.1014 where the request for hearing is filed within sixty calendar days after receipt of the notice of the QIC's reconsideration decision and so long as the amount in controversy requirement is met. 42 C.F.R. §§ 405.1002, 405.1006.

60.     The purpose of a hearing before an ALJ is to provide important procedural due process protections to an appellant-provider, including "the opportunity to have a live hearing, present testimony, submit written statements

of law and fact, and cross-examine witnesses." *Med- Cert*, 365 F. Supp. 3d at 753

(citing *Family Rehab., Inc. v. Azar*, 886 F.3d 496, 499 (5th Cir. 2018).

61.    In contrast, the Council "may, but is not required to conduct additional

proceedings, including a hearing." *Med-Cert*, 365 F. Supp. 3d at 753.

62.    The ALJ reviews an appeal under a *de novo* standard, which is less

deferential than the standard of review applied by a district court. *Id.* at 754; *see*

*also Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 191 (D.C. Cir. 2016) (concluding that

a district court's review would be more deferential than an ALJ's *de novo* review

in the Medicare claims appeal process).

63.    Where a provider or supplier disagrees with how a statistical sample

and/or extrapolation was conducted, the provider or supplier must assert the

reasons they disagree with how the statistical sampling and/or extrapolation was

conducted in the request for an ALJ hearing. 42 C.F.R. § 405.1014(a)(3).

64.    CMS has made clear that this requirement to include the reasons for

disagreement with how the statistical sample and/or extrapolation was conducted

"does not limit the appellant's ability to provide additional information or

arguments during the course of the appeal." Rather, the requirement exists to

"provide the adjudicator with information on the appellant's basis for the appeal and is necessary to evaluate the record[.]" 82 Fed. Reg. 4974, 5033 (Jan. 17, 2017).

65.    The ALJ is required to conduct "a *de novo* review" and to issue a decision "based on the administrative record, including . . . any hearing record." 42 C.F.R. § 1000(d).

66.    The ALJ's decision "must be based on evidence offered at the hearing or otherwise admitted into the record, and shall include independent findings and conclusions." *Id.* at § 405.1046(a)(1). Further, the ALJ's decision may not be based on extra-record documents. *Id.*

67.    CMS has explained that the "independent findings and conclusions" requirement is intended to express the requirement for *de novo* review and prohibits the ALJ from "merely incorporat[ing] the findings and conclusions offered by others" at the redetermination or reconsideration level. 82 Fed. Reg. 4974 at 5082, 5084.

68.    In addition to the specific reasons for the decision and a summary of any clinical or scientific evidence used in making the decision, the ALJ's decision must also include, "for any new evidence that was submitted for the first time at

the OMHA level . . . a discussion of the new evidence[.]" 42 C.F.R. § 405.1046(a)(2)(i)–(ii).

69.    ALJ decisions have been vacated where the ALJ's decision did not address relevant evidence, such as expert reports, and/or hearing testimony relevant to statistical sampling and extrapolation. *See e.g.*, *Strategic Ambulance (Appellant) (Beneficiaries) Palmetto GBA (Contractor) Claim for Supplementary Medical Insurance Benefits (Part B)*, No. M-10-770, 2012 WL 1980570 (H.H.S. Mar. 19, 2012); *Jackson Healthcare (Appellant) (Beneficiary) Cahaba GBA (Contractor) Claim for Hospital Insurance Benefits (Part A)*, No. M-11-259, 2012 WL 889345 (H.H.S. Jan. 25, 2012) (reversing the ALJ's decision for neglecting to evaluate the testimony of two experts in its decision); *Simon Becker, DPM (Appellant) (Beneficiary) Safeguard Services (PSC) (Contractor) Claim for Supplementary Medical Insurance Benefits (Part B)*, No. M-11- 1657, 2011 WL 7007042 (H.H.S. Aug. 17, 2011) (stating that "the ALJ's failure to provide any meaningful analysis or specific reasons for his decision with respect to sampling does not result in a decision that is calculated to be understood" as required by applicable regulations).

70.    In issuing a decision, ALJs are bound by all laws and regulations pertaining to the Medicare program, including Title XVIII of the Social Security

Act and applicable implementing regulations. CMS Rulings, precedential Council decisions, and NCDs are likewise binding on the ALJ. 42 C.F.R. § 405.1063.

71.    ALJs are not bound by LCDs or CMS program guidance, but will give substantial deference to these policies if they are applicable to a particular case. *Id.* at § 405.1062(a).

72.    The ALJ must consider "all the issues for the claims . . . specified in the request for hearing that were brought out in the initial determination, redetermination, or reconsideration that were not decided entirely in [the appellant's] favor." *Id.* at § 405.1032(a).

73.    Where an appellant "asserts a disagreement with how a statistical sample and/or extrapolation was conducted in the request for hearing . . . in deciding issues related to how [the] statistical sample and/or extrapolation was conducted, the ALJ or attorney adjudicator must base his or her decision on a review of the entire sample to the extent appropriate to decide the issue." *Id.* at § 405.1032(d).

74.    In conjunction with its review and decision, the ALJ has a regulatory duty to build the administrative record. This administrative record must include the originally appealed decisions, the documents and other evidence used in

making those appealed decisions, the ALJ's decision, and all other evidence. *Id.* at § 405.1042(a).

75.     Relatedly, the Fifth Circuit Court of Appeals has held that the effectuation of a final agency decision is "inextricably intertwined" with the agency's initial action and thus making effectuation an essential component of resolving ALJ appeals. *D&G Holdings, LLC v. Becerra*, 22 F.4th 470 (5th Cir. 2022).

76.     Effectuation includes an accounting of the amount of payment owed by a provider. Federal courts have made clear that "[i]t is inexcusable that the Secretary would allow [a MAC] to wield the sovereign authority of the United States to seize money from a private company but then be utterly unable to give an accounting for the amount pillaged." *D&G Holdings, LLC v. Azar*, 776 F. App'x 845, 848 (5th Cir. 2019).

77.     Given the regulatory authority granted to ALJs, it is in the purview of an ALJ to require that CMS or its contractor perform a full accounting of a provider's debts where missing documentation regarding the total amount recouped can only be provided by CMS or its contractors.

78.     The ALJ's decision on a request for hearing is binding on all parties unless "a party requests a review of the decision by Council within the stated time

period or the Council reviews the decision issued by an ALJ . . . and the Council issues a final decision . . . or the appeal is escalated to Federal district court under the provision at [42 C.F.R.] § 405.1132[.]" 42 C.F.R. § 405.1048(a)(1).

v.     **Medicare Appeals Council**

79.     Where a party is dissatisfied with the ALJ's decision, that party may appeal the ALJ's decision up to the Council, and the Council is statutorily authorized to review the ALJ's decision. 42 U.S.C. § 1395ff(b)(1)(A); 42 C.F.R. §§ 405.1100(a), 405.1102(a)(1).

80.     In reviewing the ALJ's decision, the Council is required to undertake a *de novo* review. 42 C.F.R. § 405.1100(c). In conducting its review *de novo*, the Council must consider all of the evidence in the administrative record. *Id.* at §§ 405.1108(a), 405.1122(a)(1).

81.     As with ALJs, in conducting its review, the Council is bound by all laws and regulations pertaining to the Medicare program, including Title XVIII of the Social Security Act and applicable implementing regulations. CMS Rulings, precedential Council decisions, and NCDs are likewise binding on the Council. *Id.* at § 405.1063.

82.     The Council is not bound by LCDs or CMS program guidance, but it will give substantial deference to these policies if they are applicable to a particular case. *Id.* at § 405.1062(a).

83.     In reviewing an ALJ's decision, the Council will issue a final decision or dismissal order or remand a case to the ALJ within 90 calendar days of receipt of the appellant's request for review, unless that period is extended. *Id.* at §§ 405.1100(c), 405.1108(a); 405.1128.

84.     Where the Council issues a decision, that decision will act as the final decision of the Secretary for purposes of 42 U.S.C. § 405(g) and § 1395ff(b)(1)(A) and is final and binding on all parties unless a federal district court issues a decision modifying the Council's decision. 42 C.F.R. § 405.1130.

**B.     <u>Medicare Administrative Appeals Process</u>**

85.     If a Medicare provider wishes to appeal a determination, or any post-payment claim denial, they are subject to the lengthy appeals process set forth in 42 U.S.C. § 1395ff. The Medicare appeals regulations allow for five levels of appeal as follows:

### a.    Level One: Redetermination

86.    After the initial determination that an overpayment has been made, a denied claim may be submitted to a MAC for redetermination. 42 U.S.C. § 1395ff(a)(3)(A). In the case of a denied claim, the determination is sent back to the MAC for re-review.

87.    Upon receipt of the request for redetermination, the MAC has sixty days to issue a decision. *Id.* at § 1395ff(a)(3)(C)(ii).

### ii.    Level Two: Reconsideration

88.    If the redetermination is unfavorable, the appealing party may submit a request for reconsideration. *Id.* at §§ 1395ff(b), (c).

89.    A reconsideration is a review of the MAC's redetermination conducted by a QIC. *Id.* at §1395ff(c)(B)(i).

90.    Upon receipt of the request for reconsideration, the QIC has sixty days to issue a decision. *Id.* at § 1395ff(c)(3)(C)(i).

### iii.    Level Three: ALJ Hearing

91.    A party that is dissatisfied with the QIC's reconsideration may request a hearing and *de novo* review before an ALJ with OMHA, provided the amount in controversy is met. *Id.* at § 1395ff(b)(1)(E).

92.     Under 42 U.S.C. § 1395ff(d)(1)(A), the ALJ must conduct and conclude the hearing and render a decision no later than 90 days after the request for a hearing was filed. *See also* 42 C.F.R. § 405.1016(a).

### iv.     <u>Level Four: Medicare Appeals Council Review</u>

93.     The final administrative option for appealing an unfavorable decision is an appeal to the Council. 42 U.S.C. § 1395ff(d)(2); 42 C.F.R. § 405.1108(a).

94.     Under 42 C.F.R. § 405.1100(c), the Council undertakes a *de novo* review and issues a decision, dismissal or remands the case to the ALJ within 90 days of receipt of the request for Council review.

### v.     <u>Level Five: Federal District Court and Escalation</u>

95.     If the Council does not issue a decision, dismissal or remand within 90 days, the appealing party may file a request to escalate the case to the federal district court for judicial review. 42 C.F.R. § 405.1132(a).

96.     Upon the Council's receipt of the escalation request, the Council has five days to issue a decision, dismissal, remand, or provide notice that it is unable to do so. *Id*.

97.     Guidance issued by HHS provides that the appellant party may escalate the appeal to the federal court if the adjudication period for the Council

to complete its review has elapsed and the Council is fails to issue a decision, dismissal, or remand the case to OMHA. *See* "Fifth Level of Appeal: Judicial Review in Federal District Court" (Jan. 6, 2022), available at the following website: www.cms.gov/Medicare/Appeals-and-Grievances/OrgMedFFSAppeals/Review-Federal-District -Court.

## VI.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY (JUDICIAL REVIEW OF AGENCY DECISION)

98.     For each of the five (5) final agency orders, the Defendants acted arbitrarily and capriciously by wrongfully denying coverage of Procenta (Q4244) and the associated administration claims.

99.     The Defendants, likewise, without cause, decline to apply and/or refused to consider the application of limitation of liability provisions under Section 1879 of the Social Security Act for the claims at issue.

100.     Generally, in the absence of a controlling NCD or LCD, Medicare contractors must "institute claim-by-claim review to determine whether a claim [for a placental product] meets the reasonable and necessary criteria outlined under section 1862(a)(1)(A) of the Social Security Act, as well as any other

applicable requirements for coverage payment in any statute, regulation, or guidance document."

101.    As established in the administrative records, at the time of claims, there was no applicable NCD, LCD, or "statute, regulation, or guidance document" authorizing the Defendants to automatically deny the items/services as not "safe and effective" and "investigational and experimental". Rather, the Defendants are required to conduct a tailored clinical analysis to determine Medicare coverage.

102.    More pertinent to this matter, CMS has issued Technical Direction Letter ("TDL") 220299 which expressly directed all Medicare Contractors to refrain from a wholesale denial of items and services relating to placental products.

103.    Under the TDL, CMS mandates the Medicare contractors to conduct a claim-specific clinical analysis based on the beneficiary's unique presentations and conditions.

104.    Thus, in order for the Medicare contractors to satisfy their regulatory responsibilities, they must compare the available medical research with the specific diagnosis and treatment regimen for every contested claim. Only then may they render an individual decision on medical reasonableness and necessity.

105.    In their Final Order, the Defendants denied coverage for the treatment as not being "reasonable and necessary." A treatment is reasonable and necessary (and thus eligible for Medicare coverage) if it is, *inter alia*, "safe and effective" and "not investigational or experimental." Medicare Program Integrity Manual (MPIM) § 3.6.2.2. Per the Medicare Appeals Council, these criteria are satisfied "based on authoritative evidence, or alternatively, whether the item or service is generally accepted in the medical community as safe and effective for the condition for which it is used." *In the Case of Int'l Rehab. Scis., Inc. d/b/a Rs Med. (Appellant) (Beneficiaries) Cigna Gov't Services* - (Dme Mac - Jurisdiction c) (Contractor) Claim for Supplementary Med. Ins. Benefi, No. Docket Number: M-10-1761, 2011 WL 6284700, at *3 (Unknown State Ct. (Ill.) Mar. 29, 2011).

106.    A QIC specifically is required by regulation to provide the provider notice of:

> A summary of the facts, including as appropriate, a summary of the clinical or scientific evidence used in making the reconsideration; …

> In the case of a determination on whether an item or service is reasonable or necessary under section 1862(a)(1)(A) of the Act, an explanation of the medical and scientific rationale for the decision[.]

42 C.F.R. § 405.976(b)(2) & (4). Such analyses are notably absence in the Final Decision. Instead, Defendants utilized a boilerplate "investigational/experimental and non-covered usage" finding without providing any medical or clinical rationale. Clearly, this fails spectacularly of their obligations under § 405.976(b)(2) & (4), as described above. Moreover, the boilerplate denial also fails to conform with the claim-by-claim review requirement pursuant to TDL-220299.

107.    Furthermore, during the OMHA appeal process, FFLC submitted numerous authoritative medical literature and clinical studies for consideration.

108.    None of these medical texts were mentioned or discussed in the final agency decision. Defendants have failed to properly consider these authoritative texts in rendering their wholesale denials.

109.    Particularly, there exists a wealth of authoritative medical literature that proves that placental products, such as Procenta, are safe and effective for treatment of the type of conditions suffered by the beneficiaries at issue.

110.    A number of full-scale clinical studies have proved that placental injections are safe and effective at ameliorating pain associated with osteoarthritis, tendinopathy, plantar fasciitis, and other inflammatory conditions.

111.   Notably, the research data showed that placental products containing placenta-derived mesenchymal stromal cells significantly reversed the osteoarthritis progression by protection of cartilage, regulation of anabolic (Col2) and catabolic (MMP13) expressions, and relief of pain symptoms.

112.   In 2019, a multicenter randomized controlled single-blind study was conducted among 200 subjects. The study focused on the treatment of osteoarthritis with amniotic suspension allograft (ASA). The evidence presented in this clinical trial demonstrates that the ASA injection is an effective treatment for the nonoperative management of symptomatic knee osteoarthritis.

113.   Clearly, the cited medical literature provides ample evidence concerning the efficacy of placental products for podiatric patients. Importantly, it is consistent with the applicable standards of care to utilize placental injections for such musculoskeletal treatment.

114.   The administrative records shows that the general consensus among the medical community is that conservative treatments are generally "inadequate, as they do not address the underlying pathology" and are mere "temporary solutions."

115.    Due to a number of health and economic constraints, surgical intervention may not be appropriate for a given patient. In this case, the medical records reflect that conservative treatment was attempted consistently with the applicable standards of care. Those attempts were proven to be ineffective after at least four (4) weeks of efforts. Only then did FFLC and the patients opt for the placental injection(s).

116.    The patients were given full opportunity to ask questions.

117.    The procedure was thoroughly explained to the patient in simple terms, thus affording the patient a clear picture of the risks and expectations. All of this was memorialized in the signed consents provided.

118.    Importantly, following the Procenta treatment regime, the beneficiaries invariably exhibited marked and objective improvements to the overall conditions and have reported no adverse event.

119.    It is, therefore, reasonable and medically necessary for FFLC to administer Procenta for the beneficiaries.

120.    Since the authoritative medical texts submitted satisfy the "safe and effective" and "not experimental or investigational" requirements, and it is undisputed that the administration of Procenta is within the accepted standard of

medical practice in the local communities, the claim in question must be covered under the Medicare guidelines.

121.    Additionally, Defendants erred in finding that Section 1879 of the Social Security Act inapplicable in the instant matter.

122.    Under Section 1879, Medicare may properly pay a claim if it is shown that the provider did not know, and could not be expected to know, that the services lacked medical necessity. 42 U.S.C. 1395pp(a).

123.    Courts have emphasized whether providers knew of "widely-published" CMS materials governing Medicare coverage (*see MacKenzie Med. Supply, Inc. v. Leavitt*, 419 F. Supp. 2d 766, 774 (D. Md. 2006), aff'd, 506 F.3d 341 (4th Cir. 2007); *Willowood of Great Barrington, Inc. v. Sebelius*, 638 F. Supp. 2d 98, 119 (D. Mass. 2009)) and whether the provider has received "conflicting information" concerning coverage eligibility (*Yale-New Haven Hosp., Inc. v. Thompson*, 162 F. Supp. 2d 54, 68 (D. Conn. 2001)).

124.    The Code of Federal Regulations generally revolves around the acceptable standards of practice in the local medical community, and documents publicly promulgated by CMS about coverage. 42 C.F.R. § 411.406.

125.    Furthermore, Medicare Claims Processing Manual, Chapter 30, entitled – Financial Liability Protections, provides that the Social Security Act "protect[s] beneficiaries, healthcare providers, and suppliers under certain circumstances from unexpected liability for charges associated with claims that Medicare does not pay." *See* Section 10.

126.    Specifically, Section 1879 of the Act allows for limitation of liability (LOL) where a provider of services did not know, and could not reasonably have been expected to know, that payment would not be made for such services. In accordance with regulations at 42 C.F.R. 411.406, evidence that the healthcare provider did, in fact, know or should have known that Medicare would not pay for an item or service includes:

> 1.    A Medicare contractor's prior written notice to the provider of Medicare denial of payment for similar or reasonably comparable item or service. This also includes notification of Quality Improvement Organization (QIO) screening criteria specific to the condition of the beneficiary for whom the furnished item and/or service are at issue and of medical procedures subject to preadmission review by the QIO. Instructions for application of the LOL provision to QIO determinations are in the QIO Manual;

> 2.    Medicare's general notices to the medical community of Medicare payment denial of item or service under all or certain circumstances (such notices

include, but are not limited to, manual instructions, bulletins, and Medicare contractors' written guidance);

3. Provision of the item and service being inconsistent with acceptable standards of practice in the local medical community.

4. Written notification from the healthcare provider's utilization review committee informing the healthcare provider or supplier that the item and/or service was not covered;

5. The healthcare provider issuing a written notice of the likelihood of Medicare payment denial for an item and/or service to the beneficiary; or

6. The healthcare provider or supplier being previously notified by telephone and/or in writing that an item or service is not covered or that coverage has ended.

127. In this case, there is uncontroverted evidence that none of the enumerated scenarios have occurred.

128. There has not been any notification, written or otherwise, from the Medicare contractor concerning the payment eligibility on Procenta products.

129. Furthermore, there has not been any pervious claim denial for related services.

130.    On the contrary, once the first claim was denied, FFLC immediately ceased all operations relating to placental injections. This highlights FFLC's lack of knowledge on coverage issues.

131.    Neither is this the case where Medicare has issued general guidance concerning placental injection therapy.

132.    Conversely, CMS, in its Transmittal 1024, dated July 15, 2020, specifically added Q4244, Procenta, per 200mg as valid billing code.

133.    The CMS's explicit decision to allow for billing of Procenta signals to providers that Procenta related services are billable under the Medicare guidelines.

134.    The administrative records contain ample evidence that the manufacturer of Procenta had engaged in a misleading marketing campaign to confuse the providers and boost its sales.

135.    Notably, in its promotional materials, the manufacturer repeatedly identified the product as "FDA/TRG 361 Letter on File."

136.    In addition, the manufacturer aggressively promotes Procenta for podiatric uses.

137.    The misleading marketing tactics give the impression that the product has obtained an FDA/TRG 361 letter for podiatric uses.

138.    Given the lack of contravening or competing information on Medicare coverage, it is unreasonable to expect FFLC to know that the claims will be ultimately denied by the contractor.

139.    Clearly, the records established FFLC had no actual or constructive knowledge of the Medicare coverage for Procenta. As such, the LOL provision applies and FFLC cannot be found liable.

140.    The Defendants have not produced a scintilla of evidence countering the lack of actual and constructive knowledge on FFLC's part.

141.    Defendants' refusal to apply the LOL provision constitutes a gross misapplication of the law.

## COUNT I
## OMHA Appeal Number: 3-12280366926, Beneficiary A.D.

142.    The allegations contained in paragraph 1 through 141 of this Verified Complaint are incorporated by reference as if fully set out herein.

143.    FFLC seeks judicial review of the Secretary's claim denial for service provided by FFLC to Beneficiary A.D. on June 24, 2022.

144. Initially, FFLC sought reimbursement for Procenta injection into tendon or ligament furnished to the Beneficiary on the date of service.

145. First Coast Service Options (FCSO) notified FFLC via an Explanation of Benefits Remittance ("EOB") that all claims for services provided to the Beneficiary were non-payable.

146. FFLC submitted a Request for Redetermination to the MAC for the claim(s) at issue.

147. Later, FCSO issued a fully unfavorable redetermination decision relating to this Beneficiary.

148. Thereafter, FFLC timely submitted a Request for Reconsideration to the QIC, C2C Innovative Solutions, Inc. ("C2C"), in response to FCSO's unfavorable redetermination decision.

149. FFLC incorporated all arguments set forth in its prior redetermination request and further disputed all denied claims.

150. C2C issued a fully unfavorable reconsideration decision affirming the overpayment.

151. FFLC timely filed a Request for Hearing by an ALJ with OMHA to appeal C2C's unfavorable reconsideration decision.

152.    On October 12, 2023, Administrative Law Judge Adam Wilcox ("ALJ Wilcox") issued an unfavorable Notice of Decision (the "A.D. Decision"). A redacted copy of the A.D. Decision is attached as **Exhibit F**.

153.    ALJ Wilcox wrongly concluded that "there is insufficient documentation submitted by [FFLC] to support medical necessity of, or general acceptance in the medical community for, the Procenta in this appeal."

154.    Further, "[a]s the application of Procenta for the given use to the Beneficiary does not meet the definition of homologous use in accordance with 21 C.F.R. § 1271.3(c), the criteria of 21 C.F.R. § 1271.10(a) are not met … [FFLC] did not submit documentation demonstrating FDA approval for the use of the Procenta as it was administered in the care of this Beneficiary on the date of service."

155.    Additionally, ALJ Wilcox improperly rejected the limitation of liability provision under section 1879 of the Act and held that the "the record lacks evidence refuting the presumption that [FFLC] knew, or should have known, that Medicare would not cover the services at issue, [FFLC] remains liable for the non-covered charges."

156.    On December 11, 2023, Plaintiff timely appealed the A.D. Decision to the Council.

157.    On March 24, 2025, the Council affirmed the A.D. Decision and declined to extend Medicare coverage for the claims in question.

158.    The Council's decision constitutes CMS' final agency order.

159.    Based on the foregoing, Defendants' final agency orders and their decisions to deny coverage are not supported by substantial evidence, constituted a clear error of law and an arbitrary and capricious act.

## COUNT II
## OMHA Appeal Number: 3-11787749213, Beneficiary K.K.

160.    The allegations contained in paragraph 1 through 141 of this Verified Complaint are incorporated by reference as if fully set out herein.

161.    FFLC seeks judicial review of the Secretary's claim denial for service provided by FFLC to Beneficiary K.K. on January 4, 2022.

162.    Initially, FFLC sought reimbursement for Procenta injection into tendon or ligament furnished to the Beneficiary on the date of service.

163.    First Coast Service Options (FCSO) notified FFLC via an EOB that all claims for services provided to the Beneficiary were non-payable.

164. FFLC submitted a Request for Redetermination to the MAC for the claim(s) at issue.

165. Later, FCSO issued fully unfavorable redetermination decisions relating to this Beneficiary.

166. Thereafter, FFLC timely submitted a Request for Reconsideration to C2C in response to FCSO's unfavorable redetermination decision.

167. FFLC incorporated all arguments set forth in its prior redetermination request and further disputed all denied claims.

168. C2C issued a fully unfavorable reconsideration decision affirming the overpayment.

169. FFLC timely filed a Request for Hearing by an ALJ with OMHA to appeal C2C's unfavorable reconsideration decision.

170. On May 26, 2023, Administrative Law Judge J.K. Waits ("ALJ Waits") issued an unfavorable Notice of Decision (the "K.K. Decision"). A redacted copy of the K.K. Decision is attached as **Exhibit G**.

171. ALJ Waits wrongly concluded that "Procenta has not been shown to be regulated under section 361 of the PHS Act when used in the way it was used in this case; even if Procenta were assumed to be governed by section 361, it has

42

not been shown to meet Medicare's standards for a treatment considered safe and effective for the purpose for which it was used in this case; and even if Medicare covered this application, it has not been shown that the Beneficiary had the kind of tissue wound that Procenta is allegedly effective at treating because the record lacks identification of which tissues or structures would have been expected to heal and how that healing would have been measured."

172.    Furthermore, ALJ Waits wrongly held that the "FFLC is presumed to have knowledge of the rules and procedures of Medicare Part B" and, therefore, is liable for the non-covered charges.

173.    On July 23, 2023, Plaintiff timely appealed the K.K. Decision to the Council.

174.    On March 27, 2025, the Council affirmed the K.K. Decision and declined to extend Medicare coverage for the claims in question.

175.    The Council's decision constitutes CMS' final agency order.

176.    Based on the foregoing, Defendants' final agency orders and their decisions to deny coverage are not supported by substantial evidence, constituted a clear error of law and an arbitrary and capricious act.

## COUNT III
### OMHA Appeal Number: 3-12240064967, Beneficiary T.C.

177.    The allegations contained in paragraph 1 through 141 of this Verified Complaint are incorporated by reference as if fully set out herein.

178.    FFLC seeks judicial review of the Secretary's claim denial for service provided by FFLC to Beneficiary T.C. on September 6, 2022.

179.    Initially, FFLC sought reimbursement for Procenta injection into tendon or ligament furnished to the Beneficiary on the date of service.

180.    First Coast Service Options (FCSO) notified FFLC via an EOB that all claims for services provided to the Beneficiary were non-payable.

181.    FFLC submitted a Request for Redetermination to the MAC for the claim(s) at issue.

182.    On January 10, 2023, FCSO issued fully unfavorable redetermination decisions relating to this Beneficiary.

183.    Thereafter, FFLC timely submitted a Request for Reconsideration to C2C in response to FCSO's unfavorable redetermination decision.

184.    FFLC incorporated all arguments set forth in its prior redetermination request and further disputed all denied claims.

185. On March 24, 2023, C2C issued a fully unfavorable reconsideration decision affirming the claim denial.

186. FFLC timely filed a Request for Hearing by an ALJ with OMHA to appeal C2C's unfavorable reconsideration decision.

187. On October 12, 2023, ALJ Wilcox issued an unfavorable Notice of Decision (the "T.C. Decision"). A redacted copy of the Decision is attached as **Exhibit H**.

188. ALJ Wilcox wrongly concluded that "the medication at issue does not meet Medicare's threshold of sale and effective criteria and is considered experimental or investigational as defined by Medicare law, regulations, and policies."

189. Furthermore, ALJ Wilcox improperly held that the Plaintiff "knew or reasonably should have known that the items furnished to the Beneficiary would not be covered under Medicare, payment cannot be made pursuant to § 1879 of the Act, and [FFLC] is liable for the non-covered costs."

190. On December 11, 2023, Plaintiff timely appealed the T.C. Decision to the Council.

191.    On April 3, 2025, the Council affirmed the T.C. Decision and declined to extend Medicare coverage for the claims in question.

192.    The Council's decision constitutes CMS' final agency order.

193.    Based on the foregoing, Defendants' final agency orders and their decisions to deny coverage are not supported by substantial evidence, constituted a clear error of law and an arbitrary and capricious act.

## COUNT IV
## OMHA Appeal Number: 3-11787454963, Beneficiary L.S.

194.    The allegations contained in paragraph 1 through 141 of this Verified Complaint are incorporated by reference as if fully set out herein.

195.    FFLC seeks judicial review of the Secretary's claim denial for service provided by FFLC to Beneficiary L.S. on March 9, 2022.

196.    Initially, FFLC sought reimbursement for Procenta injection into tendon or ligament furnished to the Beneficiary on the date of service.

197.    First Coast Service Options (FCSO) notified FFLC via an EOB that all claims for services provided to the Beneficiary were non-payable.

198.    FFLC submitted a Request for Redetermination to the MAC for the claim(s) at issue.

199.    On August 24, 2022, FCSO issued fully unfavorable redetermination decisions relating to this Beneficiary.

200.    Thereafter, FFLC timely submitted a Request for Reconsideration to C2C in response to FCSO's unfavorable redetermination decision.

201.    FFLC incorporated all arguments set forth in its prior redetermination request and further disputed all denied claims.

202.    On December 7, 2022, C2C issued a fully unfavorable reconsideration decision affirming the claim denial.

203.    FFLC timely filed a Request for Hearing by an ALJ with OMHA to appeal C2C's unfavorable reconsideration decision.

204.    On June 1, 2023, Administrative Law Judge Donna Dickens ("ALJ Dickens") issued an unfavorable Notice of Decision (the "L.S. Decision"). A redacted copy of the L.S. Decision is attached as **Exhibit I**.

205.    ALJ Dickens wrongly held that "there is no indication in the evidence of record that shows the provider used the treatment as a barrier for the wound, which was closed. Thus, the requirements of 21 CFR 1271 are not met, and the product as used in this appeal would be required to have FDA approval as a drug

or biological product and demonstrate that it is a safe and effective treatment. The product has not received this approval."

206.   Next, ALJ Dickens improperly concluded that "the evidence of record is not sufficient for an ALJ to determine the item at issue is safe and effective for the condition for which it was specifically used."

207.   Furthermore, ALJ Dickens wrongly held that the Plaintiff is responsible for the noncovered costs despite § 1879 of the Act.

208.   On July 28, 2023, Plaintiff timely appealed the L.S. Decision to the Council.

209.   On April 10, 2025, the Council affirmed the L.S. Decision and declined to extend Medicare coverage for the claims in question.

210.   The Council's decision constitutes CMS' final agency order.

211.   Based on the foregoing, Defendants' final agency orders and their decisions to deny coverage are not supported by substantial evidence, constituted a clear error of law and an arbitrary and capricious act.

## COUNT V
## OMHA Appeal Number: 3-11807413697, Beneficiary D.B.

212.   The allegations contained in paragraph 1 through 141 of this Verified Complaint are incorporated by reference as if fully set out herein.

213.   FFLC seeks judicial review of the Secretary's claim denial for service provided by FFLC to Beneficiary D.B. on March 8, 2022.

214.   Initially, FFLC sought reimbursement for Procenta injection into tendon or ligament furnished to the Beneficiary on the date of service.

215.   First Coast Service Options (FCSO) notified FFLC via an EOB that all claims for services provided to the Beneficiary were non-payable.

216.   FFLC submitted a Request for Redetermination to the MAC for the claim(s) at issue.

217.   On September 1, 2022, FCSO issued fully unfavorable redetermination decisions relating to this Beneficiary.

218.   Thereafter, FFLC timely submitted a Request for Reconsideration to C2C in response to FCSO's unfavorable redetermination decision.

219.   FFLC incorporated all arguments set forth in its prior redetermination request and further disputed all denied claims.

220.   On October 17, 2022, C2C issued a fully unfavorable reconsideration decision affirming the claim denial.

221.   FFLC timely filed a Request for Hearing by an ALJ with OMHA to appeal C2C's unfavorable reconsideration decision

222.    On May 26, 2023, ALJ Waits issued an unfavorable Notice of Decision (the "D.B. Decision"). A redacted copy of the D.B. Decision is attached as **Exhibit J**.

223.    ALJ Waits wrongly concluded that "Procenta has not been shown to be regulated under section 361 of the PHS Act when used in the way it was used in this case; even if Procenta were assumed to be governed by section 361, it has not been shown to meet Medicare's standards for a treatment considered safe and effective for the purpose for which it was used in this case; and even if Medicare covered this application, it has not been shown that the Beneficiary had the kind of tissue wound that Procenta is allegedly effective at treating because the record lacks identification of which tissues or structures would have been expected to heal and how that healing would have been measured."

224.    Furthermore, ALJ Waits wrongly held that the "FFLC is presumed to have knowledge of the rules and procedures of Medicare Part B" and, therefore, is liable for the non-covered charges.

225.    On July 23, 2023, Plaintiff timely appealed the D.B. Decision to the Council.

226.    On April 17, 2025, the Council affirmed the D.B. Decision and declined to extend Medicare coverage for the claims in question.

227.    The Council's decision constitutes CMS' final agency order.

228.    Based on the foregoing, Defendants' final agency orders and their decisions to deny coverage are not supported by substantial evidence, constituted a clear error of law and an arbitrary and capricious act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants for the following:

a)    An Order from this Court reversing the Secretary's final agency order for each beneficiary; and

b)    An Order from this Court requiring Defendants to reimburse Plaintiff for the claims at issue;

c)    Prejudgment and post-judgment interest;

d)    Reasonable attorney's fees and costs of suit; and

e)    Such other and further relief as the Court may deem just and proper under law.

## CERTIFICATION AND CLOSING

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this Complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

Dated: May 22, 2025                    Respectfully submitted,

                                       EDWARD L. LARSEN, ESQ., P.A.

                          By:    /s/ Edward L. Larsen
                                 Edward L. Larsen, Esq.
                                 Counsel for Plaintiff
                                 Florida Bar No.: 16700
                                 The Chamber Building
                                 2390 Tamiami Trail N., Suite 202
                                 Naples, Florida 34103
                                 (239) 643-0100
                                 Ed@EdwardLarsenEsq.com

## **VERIFICATION**

State of Florida    )
County of Collier  )

    DR. KEVIN LAM, DPM, FACFAS, being duly sworn, deposes and says that

I am the President of the Plaintiff, Family Foot & Leg Center, P.A., in the case

captioned *Family Foot & Leg Center, P.A. v. Xavier Becerra, et al*, filed in the United

States District Court for the Middle District of Florida, and have authorized the

filing of this Complaint. I have reviewed the allegations in the Complaint, and to

those allegations of which I have personal knowledge, I believe them to be true.

As to those allegations of which I do not have personal knowledge, I relied on the

Plaintiff's records pertaining to the billing of Medicare (CMS) for patients, and the

information provided by the Defendant agencies, and I believe them to be true.

                              DR. KEVIN LAM, DPM, FACFAS

STATE OF FLORIDA    )
COUNTY OF COLLIER  )

    The foregoing Verification was sworn to before me this 22 day of May
2025, by Dr. KEVIN LAM, who [ ] is personally known to me or [ ] has produced
Driver License _____ as identification.

[Notary Seal]

                    Notary Public
                    Printed Name:
                    LAZARA SANZ

LAZARA SANZ
Notary Public - State of Florida
Commission # HH 294919
My Comm. Expires Nov 24, 2026
Bonded through National Notary Assn.